## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Stuart A. Goldstein,**

**Plaintiff,**

**v.**                                                    **Case No. 05-2360-JWL**

**Sprint/United Management Company;**
**and Sprint Nextel Corporation,**


**Defendants.**

### <u>MEMORANDUM & ORDER</u>

Plaintiff Stuart A. Goldstein worked for defendants (collectively "Sprint") from 1984

through November 2003, when he was released during a reorganization. Plaintiff then filed suit

against Sprint alleging that Sprint terminated plaintiff's employment on the basis of his age in

violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., on

the basis of a perceived disability in violation of the Americans with Disabilities Act (ADA), 42

U.S.C. § 12101 et seq., and/or in retaliation for plaintiff's prior complaint of age discrimination.

This matter is presently before the court on defendants' motion for summary judgment on all

claims (doc. 52). As will be explained, plaintiff has come forward with evidence from which

a reasonable jury could conclude that plaintiff's former supervisors, who supervised plaintiff

more than six months prior to the time plaintiff was released during a reorganization but did not

supervise plaintiff at the time of his release, desired to terminate plaintiff's employment and that

they desired to do so based on plaintiff's age, based on plaintiff's perceived disability and/or in

retaliation for plaintiff's complaints of discrimination. However, plaintiff has come forward

with no evidence from which a reasonable jury could conclude that any of these supervisors participated in any way in defendants' ultimate decision to release plaintiff from his employment during a reorganization. For this reason, summary judgment in favor of defendants is warranted on all claims and the court grants defendants' motion.

**I.    Facts**

The following facts are uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff began his employment with Sprint in 1984 and, over the years, held various positions in different divisions. Without exception, the positions held by plaintiff focused on marketing and advertising activities. Plaintiff's most recent position, in Sprint's wireless division, was Senior Manager of Proposal Management (also referred to by the parties as "Contract Management"), a sales and marketing position in which plaintiff supervised a group of four employees working on Requests-for-Proposals and other proposals for the Business Supply Group. In October 2001, plaintiff began reporting directly to Randy Bryson, Director of Business Operations. The record reflects that plaintiff did not know Mr. Bryson until he began reporting to him in October 2001. In February 2002, plaintiff began reporting to a new supervisor, Greg Corwin who, in turn, reported to Mr. Bryson.

In early March 2002, Mr. Bryson gave plaintiff his annual performance review for 2001. During this time frame, the performance of all Sprint employees was analyzed pursuant to a system called "LINK," in which an employee's performance was scored anywhere from a "1," indicating that the employee's performance had "greatly exceeded expectations," to a "5,"

indicating that the employee's performance was "unacceptable."  In the 2001 LINK review that plaintiff received from Mr. Bryson, he received a "4," indicating that his performance was "below expectations."  Plaintiff was given an alternative rating under a new performance review system that Sprint was beginning to implement, the Alpha rating system.  Plaintiff received an "S" Alpha rating, indicating "substantial improvement needed."[1]  Prior to this time, plaintiff's annual performance reviews had consistently indicated that plaintiff's performance met or exceeded expectations.  Plaintiff was shocked by his LINK review.

On March 6, 2002, plaintiff formally complained about his 2001 LINK review in a detailed letter addressed to Mr. Bryson, Mr. Corwin and Deb Sprayberry, a Sprint human resources representative.  At the conclusion of his letter, plaintiff states that he is uncertain whether his negative performance review "is age discrimination, personal discrimination or the desire to unjustly identify me as a future RIF candidate, but the review and the review process are 100% unacceptable to me."  During this same time frame, plaintiff also expressly asked Jed Dodd, Mr. Bryson's supervisor, whether plaintiff had been the victim of age discrimination.  Thereafter, plaintiff received an apology from Mr. Dodd and Mr. Bryson and Mr. Bryson expressed a desire to reestablish a working relationship with plaintiff.  On March 12, 2002, Anita Otto, plaintiff's supervisor for the first part of 2001, and Mr. Bryson reevaluated plaintiff's performance and plaintiff received a "3" rating, indicating his performance met expectations and all negative comments appearing on the initial 2001 LINK review were removed in the new

---

[1]The record reflects that Alpha ratings, at that time, were not considered in making RIF decisions and had no affect on merit pay increases.

version.  Mr. Dodd notified human resources of the change, explaining that the initial rating was

an "error in judgment" by his management team.  At this time, plaintiff was also offered the

opportunity to work for another supervisor, which he apparently declined.

In late March 2002, Mr. Corwin inadvertently e-mailed to plaintiff and his other direct

reports a confidential memorandum and organizational chart showing a possible reorganization

of Mr. Bryson and Mr. Corwin's team.  The chart reflected that the potential reorganization

would result in the termination of plaintiff's employment but that all other employees on the

team (approximately 120 employees) would retain positions with Sprint.  After reviewing the

e-mail, plaintiff met with Mr. Bryson to discuss the contents of the e-mail.  Mr. Bryson told

plaintiff that he had 90 days to find another position or his employment would be terminated.

Plaintiff then met with Mr. Dodd, who assured plaintiff that he would not be affected by this

particular reorganization and that his job was safe at that time.[2]

In early April 2002, Mr. Corwin resigned his employment and plaintiff began reporting

to a new supervisor, Susan Odneal.  Beginning May 12, 2002, plaintiff took short-term disability

(STD) leave for back pain.  Although plaintiff's STD leave was to expire on August 5, 2002,

Sprint extended plaintiff's STD leave and benefits until November 17, 2002.  In late November

2002, Ms. Odneal and Russ Hightower, a Sprint human resources representative, telephoned

plaintiff at home to notify him that his STD leave had expired on November 17, 2002.  As

plaintiff had not returned to work and his leave had expired, Ms. Odneal and Mr. Hightower

---

[2]During plaintiff's employment with Sprint, particularly after 2001, Sprint
experienced several reorganizations and RIFs.

4

advised plaintiff that he could return to work; terminate his employment; or take long-term disability leave.  According to plaintiff, Ms. Odneal and Mr. Hightower pressed plaintiff to either take long-term disability leave or end his employment with Sprint.  When plaintiff responded that he could not return to work until early January 2003, Ms. Odneal told plaintiff that, as he was unable to return to work earlier than January 2003, his employment was terminated.  To avoid this consequence, plaintiff returned to work on December 2, 2002. Upon plaintiff's return to work in December 2002, he discovered that Ms. Odneal had essentially divided plaintiff's position into two positions, leaving him with responsibility for the contracts team and giving responsibility for the proposals team to another individual.  According to Ms. Odneal, she divided up the responsibilities after performing plaintiff's duties herself while he was on STD leave and she believed the workload was too much for one person.

During plaintiff's absence from work, James Kissinger, Sprint's Vice President of Human Resources, announced via e-mail a new policy of aggressively challenging STD claims, noting that "no one should find refuge in STD."  In response to that e-mail, Mr. Dodd advised that he "had a worn, cattle path to HR from employees requesting STD.  In most of the recent ones, it has involved employees on some form of corrective action.  This burns me up."  In response to Mr. Dodd's e-mail, another human resources representative then references the "S. Goldstein" case.  During this same time frame, Mr. Bryson, in response to an e-mail advising him that plaintiff's STD leave had been extended, queried whether an employee on STD was subject to layoff or reorganization.  Ms. Odneal, upon learning that plaintiff's STD leave had been extended, sent an e-mail response to Mr. Bryson with one word–"YIKES!"

In March 2003, Ms. Odneal gave plaintiff his annual performance review for 2002, his 2002 LINK review.  While the record is not entirely clear, plaintiff apparently received only an Alpha rating in this review and he received an "L" rating, the lowest rating possible.  As plaintiff highlights, Ms. Odneal had supervised plaintiff for only a few weeks during 2002–just before and just after his STD leave.  In her written comments on plaintiff's 2002 LINK review, Ms. Odneal wrote: "In 2002, Stu's involvement with the team was somewhat lacking.  He experienced STD leave for half the year, missing much activity during the year."  Mr. Bryson did not participate in any way in plaintiff's performance evaluation for 2002.  In July 2003, Ms. Odneal was transferred to another position and plaintiff began reporting to a new supervisor, Mike Gochis.  Prior to this time, plaintiff and Mr. Gochis had never worked together and did not know each other.  In late September, plaintiff received an interim review from Mr. Gochis in which Mr. Gochis noted that plaintiff meeting his performance objectives and made several positive comments about plaintiff's performance in 2003.

In October 2003, Sprint began restructuring several business organizations, including plaintiff's organization.  Thus, plaintiff and his contracts management team were affected by this restructuring.  In connection with the restructuring effort, DeAnna Alexander, an employee relations specialist in Sprint's human resources department, began gathering information on all of the reorganized business groups that she supported in the wireless division.  Ms. Alexander then determined each organization's function and where it would fit within the new structure, called "Sprint Business Solutions" (SBS).  When Ms. Alexander analyzed the functions of Mr. Gochis's teams and the target functions for SBS, she determined that plaintiff's contracts team

should be allocated to the "marketing" pool in the sales organization.  A "pool" was a list showing that an employee was eligible to work in a specific organization.  Because plaintiff's contracts team was in the marketing pool, members of that team were eligible for marketing positions.  Ms. Alexander then gave her recommendations to Mike Upchurch, who was leading SBS.

Ultimately, the functions of plaintiff's team were reassessed and, on October 28, 2002, the contracts team was removed from the marketing pool of the sales organization and re-pooled in the pricing group of the finance organization.   By that time, however, Holly Valenta, the Assistant Vice President of Pricing, had already selected from the initial pricing pool her pricing manager positions for the new organization.  In fact, Ms. Valenta had selected her managers by October 24, 2003.  Thus, when she learned that the contracts team was going to be moved from the marketing pool to her pool, she stated that because the contracts team had not been identified earlier, she could not guarantee jobs for everyone on the team.

Upon realizing that plaintiff's contracts team was added to her pool, Ms. Valenta contacted Gene Lampe, a Sprint human resources representative who was assisting Ms. Valenta in the selection process, and advised Mr. Lampe that plaintiff and his team needed to be considered for positions in the pricing group.  Mr. Lampe then reviewed plaintiff's "succession planning profile" to determine whether he would qualify for a manager position in Ms. Valenta's pricing group.  Mr. Lampe determined that plaintiff did not have any prior experience in finance and that he did not have the financial or analytical skills that were required for manager positions in the pricing group.  Mr. Lampe then discussed with Ms. Valenta plaintiff's background and

7

skill sets (and provided to Ms. Valenta a copy of plaintiff's succession planning profile). Ultimately, Ms. Valenta determined that she would not substitute plaintiff for one of the managers that she had already selected, each of whom had a strong background in finance (and each of whom was younger than plaintiff). On November 6, 2003, Ms. Valenta informed Mr. Gochis that plaintiff had not been slotted to a position. Shortly thereafter, Mr. Gochis notified plaintiff that he had not been selected for a position in the pricing group and presented plaintiff with a separation package.

The parties dispute whether plaintiff's name was placed on the "management redeployment" list (a list of managers who had been displaced by the organization and who were available to be picked up by another organization) after his release. Mr. Lampe was responsible for preparing the redeployment list for the finance organization and he did so based on information provided to him from human resources managers and employee relations specialists concerning the names of each manager-level employee who had not been placed in any position during the reorganization. Mr. Gochis testified that plaintiff's name was on the list because Mr. Gochis was asked to confirm plaintiff's placement on this list. Mr. Lampe testified that the redeployment list was last updated on October 24, 2003 (the date by which all managerial positions for the finance organization had been filled) and that plaintiff's name did not appear on the list. Plaintiff also avers that during the time frame when he was attempting to find another position with defendants, he was told by at least two groups that his name was not on the "list" and that, as a result, he could not be considered for any open positions. In any event, despite his efforts to secure another position at Sprint, plaintiff was never able to do so.

8

Plaintiff was officially released from his employment on December 31, 2003. At that time, he was 48 years old. He believes that his job duties were given to two younger individuals as the people who used to report to plaintiff began reporting to these two individuals. All members of plaintiff's team ultimately secured positions in the finance organization. All of these individuals, except one, were younger than plaintiff. Nonetheless, it is undisputed by plaintiff that Ms. Valenta, at the time she declined to select him for a manager position and made the decision to release plaintiff, had no knowledge that plaintiff was over 40, had no knowledge about the length of time that plaintiff had been employed with Sprint, had no knowledge that plaintiff had complained about age discrimination and had no knowledge that plaintiff had taken STD leave. Indeed, at the time she made her decision, Ms. Valenta did not know plaintiff and had never met plaintiff. It is further uncontroverted by plaintiff that Ms. Valenta never had any discussions with Mr. Bryson about plaintiff in any respect and that she never discussed plaintiff's work performance or medical history with Ms. Odneal or Mr. Gochis. Ms. Valenta had no knowledge of plaintiff's LINK review ratings. No evidence in the record that Ms. Valenta had any discussions or interaction with Mr. Dodd about plaintiff in any respect. It is uncontroverted that Mr. Lampe, at the time Ms. Valenta declined to select plaintiff for a manager position, had not had any discussions with anyone about plaintiff in any respect. Mr. Lampe testified that he did not know Mr. Bryson or Mr. Gochis and, although he knew Mr. Dodd, had not had any discussions with Mr. Dodd about plaintiff. Ms. Odneal avers, and plaintiff does not dispute, that she never discussed plaintiff's medical history with Mr. Lampe. Mr. Lampe testified that he has never met plaintiff and has never spoken with plaintiff.

9

**II.    Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id*. (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Id.* (citing Fed.

R. Civ. P. 56(e)).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1); *see also Kaster v. Safeco Ins. Co. of Am.*, 2003 WL 22854633, at *2 (10th Cir. Dec. 3, 2003) (affirming the district court's grant of summary judgment in favor of defendant in an ADEA case where the plaintiff had failed to present evidence sufficient for a reasonable jury to conclude that Safeco's employment decisions were age-related); *Young v. White*, 2003 WL 21940941, at *1-2 (10th Cir. Aug. 14, 2003) (affirming district court's grant of summary judgment in favor of defendant in race discrimination and retaliation context).

## III.    Discussion

Plaintiff asserts that Sprint discriminated against him on the basis of his age, on the basis of a perceived disability and/or in retaliation for plaintiff's prior complaint of age discrimination.[3]  As plaintiff has no direct evidence of discrimination, each of his claims is

---

[3]As the court understands it, plaintiff is not asserting a retaliation claim under the ADA.  In other words, the court does not believe that plaintiff is contending that defendants released plaintiff from his employment in retaliation for plaintiff's taking short-term disability leave (as distinguished from plaintiff's contention that defendants released plaintiff from his employment on the basis of plaintiff's perceived disability as reflected by, among other things, defendants' treatment of plaintiff in connection with his short-term disability

analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Pippin v. Burlington Resources Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (age); *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (disability); *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1135 (10th Cir. 2005) (retaliation).  Under the *McDonnell Douglas* framework, plaintiff has the initial burden of establishing a prima facie case of discrimination or retaliation.  *See Pippin*, 440 F.3d at 1192; *MacKenzie*, 414 F.3d at 1274; *Medina*, 413 F.3d at 1135.  If he establishes a prima facie case, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for taking the adverse employment decision.  *See Pippin*, 440 F.3d at 1193; *MacKenzie*, 414 F.3d at 1274; *Medina,* 413 F.3d at 1136.  If defendants offer a legitimate, nondiscriminatory reason for their actions, summary judgment against plaintiff is warranted unless he shows that here is a genuine issue of fact as to whether defendants' reason is pretextual.  *Pippin*, 440 F.3d at 1193; *MacKenzie*, 414 F.3d at 1274; *Medina*, 413 F.3d at 1136.[4]

---

leave).  Defendants' briefing is directed solely at plaintiff's ADEA retaliation claim and is consistent with the pretrial order, which does not articulate a retaliation claim under the ADA.  Plaintiff's brief, while generally referencing retaliation claims under the ADA, does not address any protected activity other than plaintiff's complaint of age discrimination.

[4]The court recognizes that a plaintiff is not necessarily required to rely on the *McDonnell Douglas* scheme of proof and may also attempt to meet his or her burden of showing that discrimination factored into the challenged decision "directly, by showing direct or circumstantial evidence" that discrimination was a factor in the employment decision.  *See, e.g., Greene v. Safeway Stores, Inc*., 98 F.3d 554, 557, 559 (10th Cir. 1996).  Plaintiff here attempts to satisfy his burden using the *McDonnell Douglas* scheme of proof.  The court notes, however, that its resolution of defendants' motion would be the same regardless of the method of proof utilized by plaintiff.

Defendants move for summary judgment on each of plaintiff's claims, contending first that plaintiff cannot establish a prima facie case of age discrimination, disability discrimination or retaliation.  Sprint also contends that plaintiff cannot show that defendants' legitimate, nondiscriminatory reason for releasing plaintiff during the reorganization is pretextual.  As explained more fully below, the court concludes that plaintiff has shown the existence of genuine issues of material fact with respect to his prima facie case of age discrimination but has not shown a genuine issue of material fact as to whether defendants' proffered reason for their actions is pretextual.  The court, then, grants defendants' motion for summary judgment on plaintiff's claim of age discrimination.  With respect to plaintiff's disability discrimination claim, while the court concludes that plaintiff has shown genuine factual disputes concerning whether defendants regarded him as disabled, the court concludes that summary judgment in favor of defendants is nonetheless warranted as plaintiff has not shown a genuine issue of material fact as to whether defendants terminated plaintiff's employment because of that perceived disability.  Finally, the court grants summary judgment on plaintiff's retaliation claim on the grounds that plaintiff has not shown any genuine factual disputes as to whether a causal connection exists between plaintiff's complaint of age discrimination and defendants' decision to release plaintiff from his employment.   Thus, the court grants defendants' motion in its entirety.

A.      *Plaintiff's Prima Facie Case of Age Discrimination*

To establish a prima facie case of age discrimination in the context of a reduction in force (RIF) or reorganization, plaintiff must show: (1) he was within a protected age group; (2) he was

doing satisfactory work; (3) he was discharged despite the adequacy of his work; and (4) there is some evidence the employer intended to discriminate against him in reaching its RIF decision. *Pippin*, 440 F.3d at 1192-93 (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1454 (10th Cir. 1994)). The fourth element may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the RIF." *Id.* at 1193 (quoting *Beaird*, 145 F.3d at 1165).

Sprint urges that plaintiff cannot establish the second element of his prima facie case, an element that Sprint asserts requires plaintiff to show that he was qualified for a managerial position in the pricing group. *See Rea*, 29 F.3d at 1454 (stating that a plaintiff's prima facie case in the RIF context includes a showing that he was "qualified for the position at issue").[5] The court rejects this argument as defendants also assert that plaintiff's alleged lack of qualifications was the reason for their employment decision. This court, relying on established Tenth Circuit precedent, has repeatedly declined to analyze an employer's assessment of the plaintiff's qualifications at the prima facie stage where the employer (like defendants here) also asserts that the plaintiff's alleged lack of qualifications was the employer's legitimate, nondiscriminatory reason for taking the adverse employment action. *See, e.g., Roberts v. Sedgwick County Sheriff's Dept.*, 302 F. Supp. 2d 1256, 1263 (D. Kan. 2004) (citing *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192-94 (10th Cir. 2000)); *Reed v. Unified Sch. Dist. No. 233*, 299 F. Supp. 2d 1215, 1224 (D. Kan. 2004) (same); *Bennett v. Emerson Elec. Co.*, 160 F. Supp. 2d

---

[5]Sprint does not dispute that plaintiff was doing satisfactory work as Senior Manager of Proposal Management.

1244, 1249 (D. Kan. 2001) (citing *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1316 n.11

(10th Cir. 1999)).  The court, then, will not require plaintiff, as part of his prima facie case, to

disprove defendants' proffered reason for releasing him during the reorganization.[6]

Defendants also contend that plaintiff cannot establish the fourth element of his prima

facie case as he has no evidence whatsoever that defendants intended to discriminate against him

in the reorganization.  In support of this argument, defendants rely primarily on the undisputed

fact that Ms. Valenta had no knowledge of plaintiff's age and, thus, could not have been

motivated by plaintiff's age in her decision to release him.  While the court will address this

argument in connection with plaintiff's showing of pretext, the court believes that plaintiff has

satisfied the fourth prong of his prima facie case regardless of Ms. Valenta's knowledge of

plaintiff's age.  *See Beaird*, 145 F.3d at 1166 ("[W]e . . . [are] mindful that the burden-shifting

framework "allows victims of age discrimination to prevail without presenting *any* evidence that

---

[6]In their reply, defendants assert that plaintiff has not even shown that he was "minimally qualified" for a managerial position in the pricing group.  *See Roberts*, 302 F. Supp. 2d at 1263 ("for purposes of assessing plaintiff's prima facie case, the court need only conclude that plaintiff has shown through credible evidence, including his own testimony, that he was at least minimally qualified for the position he held, even if defendants dispute that evidence") (citing *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1193-94).  At the very least, plaintiff has raised a genuine issue of fact as to whether he was minimally qualified for a managerial position in the pricing group.  For if, in fact, plaintiff was not even minimally qualified to hold a managerial position in the pricing group, then defendants' decision to place plaintiff in the pricing group pool is itself suspect.  According to defendants, they made the decision to pool plaintiff and his team in the pricing group of the finance organization after a determination that the functions performed by plaintiff and his team would fit best in that group.  Presumably, defendants would not have pooled plaintiff in the pricing group had plaintiff, as defendants now assert, lacked any qualifications whatsoever to perform the requisite functions required of a manager in that group.

age was a determining factor in the employer's motivation.") (emphasis in original).  As the Tenth Circuit stated in *Pippin*, the fourth element of plaintiff's prima facie case may be satisfied "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the RIF."  Plaintiff has come forward with evidence that he was treated less favorably than younger employees; namely, each of the individuals selected by Ms. Valenta as managers in the pricing group were younger than plaintiff and plaintiff's job duties were assumed by two younger individuals.  *See Pippin*, 440 F.3d at 1193 (plaintiff satisfied fourth prong of prima facie case where younger employee assumed plaintiff's job duties); *Beaird*, 145 F.3d at 1167 (fourth prong is satisfied if the plaintiff shows that the employer could have retained him, but chose instead to retain a younger employee).

For the foregoing reasons, the court rejects defendants' argument that plaintiff has failed to establish a prima facie case of age discrimination.

B.    *Plaintiff's Showing of Pretext with Respect to his Age Discrimination Claim*

As plaintiff has established a prima facie case for purposes of defendants' motion for summary judgment, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their employment decision.  According to defendants, they released plaintiff from his employment because Ms. Valenta, who had already slotted her pricing group managers by the time plaintiff and his team were repooled in the pricing group, decided that plaintiff's qualifications (namely, his lack of a strong financial background) did not warrant substituting plaintiff for one of the managers that she had already selected, each of whom had a strong

16

background in finance.  Plaintiff concedes that defendants have met their burden of production

and, thus, the burden shifts back to plaintiff to show that defendants' proffered reason is a pretext

for discrimination.  *See Pippin*, 440 F.3d at 1193.  In other words, plaintiff must "resist summary

judgment by presenting evidence that the proffered reason was 'unworthy of belief.'" *Id*.

In an effort to show pretext, plaintiff first asserts that defendants have presented

conflicting evidence concerning Ms. Valenta's role in the decision to terminate plaintiff, thus

casting doubt as to whether Ms. Valenta was the sole decisionmaker or even the actual

decisionmaker.  According to plaintiff, defendants, in response to an interrogatory, identified Ms.

Valenta as the person who decided to terminate plaintiff but Ms. Valenta, in her deposition,

testified that she did not make the decision to terminate plaintiff.  Plaintiff contends that this

contradiction, standing alone, is sufficient to establish pretext.  Plaintiff, however, has misstated

defendants' response to the interrogatory and has misconstrued Ms. Valenta's testimony.  While

plaintiff's interrogatory asked defendants to identify "all persons involved in the decision to

terminate plaintiff," defendants' response explained that "Holly Valenta made the decision to

release plaintiff due to a reduction in force."  Defendants, then, did not state that Ms. Valenta

made the decision to terminate plaintiff.  All parties have consistently distinguished between a

"termination" of employment and a "release" from employment (even though the end result is

the same–the person is no longer employed) and plaintiff himself does not dispute that he

distinguishes being "released" in the context of a reduction in force from an involuntary

"termination."[7]  The following excerpt from Ms. Valenta's deposition is consistent with the distinction drawn by the parties:

> Q: Did you make the decision that Stu Goldstein's position with Sprint should be terminated as part of a reduction in force?
>
> A: I don't understand the question as it relates to a position that is terminated.
>
> Q: Did you decide that Stu Goldstein should be terminated as part of a reduction in force?
>
> A: No, I did not.

A reading of Ms. Valenta's deposition, however, reflects without question that Ms. Valenta, by deciding not to slot plaintiff for a manager position in the pricing group, effectively made the decision to release plaintiff from his employment.  Plaintiff, then, has not persuasively shown any contradictory evidence concerning Ms. Valenta's role in the decisionmaking process.

Plaintiff also contends that defendants' assertion that plaintiff lacked the requisite qualifications for a pricing group manager position is pretextual because Ms. Valenta, having already selected her managers at the time plaintiff was repooled in the pricing group, could not and did not consider plaintiff's qualifications in any respect.  This argument is presumably based on the following statements made in defendants' memorandum in support of their motion for summary judgment:

> [A]s discussed above, Plaintiff did not have the necessary qualifications for Valenta's pricing group. . . . [B]y the time Plaintiff had been "pooled" in the pricing group, Valenta had already slotted all managerial positions. . . .  Because

---

[7]Indeed, in a written job application after his release from employment with defendants, plaintiff certified that he had never been terminated from employment.

> Plaintiff was not a finance candidate until after Valenta filled all of the level 4 managerial positions, Valenta could not consider Plaintiff's qualifications, age, disability, height, ethnicity or any other distinguishing feature. Simply, if Plaintiff was not in the pool of candidates, he did not get any consideration, good or bad.

Defendants' summary of the "evidence" in this fashion is careless and confusing, as the evidence in the record does not support this version of events at all. Indeed, as defendants apparently realized by the time they filed their reply brief, the uncontroverted evidence demonstrates that plaintiff was considered for a managerial position despite the timing of his transfer to the pricing group pool.[8] After considering those qualifications, Ms. Valenta determined that she would not substitute plaintiff for one of the managers whom she had already selected, each of whom, unlike plaintiff, had a strong background in finance.

Plaintiff next asserts that defendants' "unexplained" failure to include him on the redeployment list in October 2003 evidences pretext as it is a "disturbing procedural irregularity" that precluded plaintiff from having the same opportunity as others to be redeployed and to continue his employment with defendants. *See Pippin*, 440 F.3d at 1193 (in non-RIF context, evidence of pretext may include disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria)"). As an initial matter, plaintiff does not explain how defendants' failure to include plaintiff's name on the redeployment list casts doubt on defendants' proffered reason for releasing plaintiff, particularly as there is no evidence that Ms. Valenta participated

---

[8]Plaintiff does not suggest that the timing of his repooling to the pricing group was, in itself, suspect or that defendants purposefully transferred plaintiff to the pricing group after the managers for that group had been selected so that plaintiff would miss out on an opportunity to secure a manager position.

in any way in compiling the redeployment list.  Even more significantly, plaintiff has come

forward with no evidence suggesting that any of the supervisors who may have wanted to

terminate plaintiff's employment for discriminatory reasons (*e.g.*, Ms. Odneal, Mr. Bryson)

played a part in the omission of plaintiff's name from the redeployment list.  Thus, in the

absence of evidence linking any potentially discriminatory actors to the omission of plaintiff's

name, no "disturbing" procedural irregularity exists sufficient to show pretext.  Similarly,

assuming the omission of plaintiff's name was intentional, plaintiff has not shown that any of

the individuals who might be responsible for that omission (namely, Mr. Lampe or Mr. Gochis)

bore any discriminatory animus toward plaintiff or had knowledge of plaintiff's discrimination

complaints.

Finally, plaintiff asserts that defendants' treatment of plaintiff concerning his STD leave

is sufficient to establish pretext.  Specifically, plaintiff highlights Mr. Bryson's e-mail inquiring

whether plaintiff could be terminated while on STD leave and Ms. Odneal's performance review

of plaintiff in which she expressly referenced plaintiff's STD leave and then gave plaintiff the

lowest rating possible.  Again, plaintiff does not explain how this evidence casts doubt on

defendants' proffered reason for releasing him during the reorganization.  There is certainly no

evidence that Ms. Valenta or Mr. Lampe treated plaintiff poorly in connection with his STD

leave–indeed, it is undisputed that neither Ms. Valenta nor Mr. Lampe had knowledge of

plaintiff's medical status or the fact that he had taken STD leave.  Moreover, plaintiff has come

forward with no evidence linking Ms. Odneal or Mr. Bryson to the decision to release him from

his employment and it is undisputed that neither Ms. Valenta nor Mr. Lampe ever discussed

plaintiff with either Ms. Odneal or Mr. Bryson.  In other words, even assuming Ms. Odneal or

Mr. Bryson bore some discriminatory animus against plaintiff, there is no evidence that any of

the individuals involved in the decision to release plaintiff from his employment were tainted

in any way by that animus.  *See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d

476, 487-88 (10th Cir. 2006) (employer may be liable for the discriminatory acts of a biased

subordinate even if that subordinate is not the formal decisionmaker but has caused the adverse

employment action);  *Kendrick v. Penske Transp. Serv., Inc*., 220 F.3d 1220, 1231-32 (10th Cir.

2000) (where manager was not "simply a rubber stamp or conduit for an employment decision

made in reality by underlings" but conducted his own investigation into events, he was not

responsible for an underling's allegedly discriminatory actions); *Shager v. Upjohn Co.*, 913 F.2d

398, 405 (7th Cir. 1990) (if committee discharged plaintiff for reasons untainted by supervisor's

animus against older workers, link between animus and discharge is severed).

Plaintiff, then, has not shown any genuine factual disputes concerning whether

defendants' proffered reason for releasing plaintiff is pretextual.  Moreover, plaintiff directs the

court to no age-biased remarks made by any of his supervisors or the decisionmakers in this case.

In addition, it is undisputed that Ms. Valenta, at the time she decided to release plaintiff from his

employment, had no knowledge of plaintiff's age or his length of service with defendants.

Finally, the court notes that plaintiff does not contend that the reorganization itself was not

legitimate and he does not dispute that some number of employees had to be released as a result

of the reorganization.  *See Pippin*, 440 F.3d at 1193 (in a RIF case, plaintiff may show pretext

by presenting evidence that the RIF generally was pretextual).  In such circumstances, no

reasonable jury could conclude that the adverse action suffered by plaintiff was based, even in part, on plaintiff's age. Summary judgment is granted in favor of defendants on plaintiff's claim of age discrimination.

C.    *Plaintiff's Prima Facie Case of Disability Discrimination*

To establish a prima facie case under the ADA, plaintiff must establish that (1) he is a disabled person as defined by the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) his employer discriminated against him because of his disability. *See MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (citing *Butler v. City of Prairie Village*, 172 F.3d 736, 748 (10th Cir. 1999)). In their motion for summary judgment, defendants contend that plaintiff cannot establish any of the elements of his prima facie case.[9]

In showing that he is a "disabled person as defined by the ADA" for purposes of establishing the first element of his prima facie case, plaintiff must show that he has a physical or mental impairment that substantially limits one or more of his major life activities; that he has a record of such an impairment; or that he is regarded as having such an impairment. *See id.* at 1275. Here, plaintiff proceeds only under the "regarded as" definition of disability. A person

---

[9]In support of their assertion that plaintiff is not qualified to perform the essential functions of the job desired, defendants make the same arguments advanced in connection with plaintiff's prima facie case under the ADEA. For the same reasons the court rejected that argument in the context of plaintiff's ADEA prima facie case, the court rejects defendants' argument that plaintiff has not established the "qualified" prong of his prima facie case under the ADA.

is regarded as disabled when his or her employer mistakenly believes that the employee has a physical impairment that substantially limits one or more major life activities, or when his or her employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *See Kelly v. Metallics West, Inc.*, 410 F.3d 670, 675 n.5 (10th Cir. 2005) (citations and quotations omitted).

The court concludes that plaintiff has raised genuine issues of material fact as to whether defendants regarded plaintiff as disabled such that plaintiff has satisfied the first prong of his prima facie case. To be sure, there is evidence from which a reasonable jury could conclude that defendants believed that plaintiff, in fact, did not have a disability at all and was malingering in his extended disability leave. The e-mail string initiated by Mr. Kissinger concerning employees seeking "refuge" in STD leave–an e-mail string that specifically references plaintiff–certainly supports the conclusion that defendants regarded plaintiff as not disabled. Other evidence, however, supports the conclusion that defendants believed that plaintiff was substantially limited in his ability to work as a result of his back injury and disability leave. According to plaintiff, Ms. Odneal urged plaintiff to resign his employment in lieu of returning from disability leave and, upon learning that plaintiff could not return to work until January 2003, attempted to terminate his employment. Upon his return, Ms. Odneal significantly reduced plaintiff's job duties. In connection with plaintiff's annual performance review, Ms. Odneal questioned plaintiff's "ability to meet future business challenges" and, in doing so, expressly criticized his leadership ability in light of the fact that he had been on disability leave for a good portion of the year. Finally, Mr. Bryson, in direct response to an e-mail notifying him that plaintiff's STD

leave had been extended, sent an e-mail inquiring whether an employee on STD leave could be terminated.

In concluding that this evidence is sufficient to create a genuine issue of fact on whether defendants regarded plaintiff as disabled, the court is persuaded in part by the Sixth Circuit's decision in *Ross v. Campbell Soup Company*, 237 F.3d 701 (6th Cir. 2001). In *Ross*, the Sixth Circuit reversed the district court's grant of summary judgment on the plaintiff's "regarded as" claim, a claim arising out of plaintiff's absences from work as a result of a back injury. *Id.* at 702. In reversing the district court, the Sixth Circuit cited to evidence that one of the plaintiff's supervisors had referenced plaintiff's disability-related absences in an annual performance review ("We can't have any more of this back thing."), that the company offered to help him find another job elsewhere and that a supervisor told him while he was on disability leave that if he did not return to work the company would deem his job abandoned. *See id.* at 703. In addition, the plaintiff, upon returning to work, received his first negative performance review. *See id.* at 703-04. During this same time frame, another supervisor asked company management "When can we bring this problem person to a termination status. P.S. Back Case." *See id.* at 704. The Circuit concluded that this evidence "demonstrating the prominence of [the plaintiff's] back condition in Campbell's decisions regarding his employment" was sufficient to create a genuine issue of material fact concerning the plaintiff's claim that the company regarded him "through the lens of his medical condition" and, thus, as a person with a disability within the meaning of the ADA. *See id.* at 706-07.

Defendants contend that plaintiff cannot show that they regarded him as disabled because

there is no evidence that Ms. Odneal or Mr. Bryson regarded plaintiff as unable to perform a broad range of jobs. *See Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1157 (10th Cir. 2004) ("An employee is perceived as substantially limited in working when the employer believes the employee 'is unable to perform either a class of jobs or a broad range of jobs in various classes.'"). The *Ross* court rejected this same argument, explaining:

> Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult. Yet the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute. Whether [plaintiff] is such a plaintiff lies in the question of whether Campbell Soup Co. regarded him as substantially limited from performing a broad class of jobs.

*Id*. at 709. Ultimately, the Sixth Circuit concluded that resolution of that issue was properly left to the jury. *See id.* Similarly, the court here concludes that the evidence in this case, particularly the evidence concerning Mr. Bryson's and Ms. Odneal's desire to terminate plaintiff's employment–is susceptible to reasonable inferences that defendants viewed plaintiff as unable to perform a wide variety of jobs.

Finally, defendants contend that there is no evidence that the alleged misperception by plaintiff's supervisors was based on any "myth, fear, or stereotype" as required in the Tenth Circuit. *See Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1133 (10th Cir. 2003)

(A plaintiff asserting a "regarded as" claim must show that the employer regarded her as having an impairment substantially limiting her ability to perform a broad range of jobs and that the employer's misperception was "based on 'myth, fear, or stereotype,' including concerns regarding safety, insurance, liability, and acceptance by coworkers and the public.").  There is ample evidence in the record from which a reasonable jury could conclude that Ms. Odneal and Mr. Bryson were concerned about plaintiff's productivity and attendance, concerns that the Tenth Circuit has identified as "recognized indicators of discrimination based on myth, fears, and stereotypes." *Id*. at 1133-34.  The court, then, rejects this argument.

While the court thus concludes that plaintiff has come forward with sufficient evidence to create a genuine factual dispute as to whether defendants regarded him as disabled, the court nonetheless concludes that defendants are entitled to summary judgment on plaintiff's disability claim as no reasonable jury could conclude, based on the evidence presented here, that defendants terminated plaintiff's employment because of that perceived disability.  *See MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (to establish prima facie case of disability discrimination, the plaintiff must show that his employer discriminated against him because of his disability).  Significantly, plaintiff has come forward with no evidence linking Ms. Odneal or Mr. Bryson to the decision to release him from his employment. Thus, the fact that Ms. Odneal and/or Mr. Bryson may have regarded plaintiff as disabled is immaterial.  *See Rakity v. Dillon Cos*., 302 F.3d 1152, 1163 (10th Cir. 2002) (fact that one supervisor may have considered plaintiff disabled immaterial in light of undisputed fact that that supervisor was not responsible for adverse employment action).

In support of his assertion that genuine issues of material fact exist concerning whether defendants terminated plaintiff's employment because of a perceived disability, plaintiff relies on the same "pretext" arguments that he set forth in connection with his age discrimination claim. The court has rejected each of those arguments above and, for the same reasons, does so here. Moreover, it is undisputed by plaintiff that Ms. Valenta, at the time she made the decision to release plaintiff, did not know plaintiff, had never met plaintiff and had never discussed with anyone plaintiff's medical history or the fact that he had taken STD leave. Similarly, it is undisputed that Mr. Lampe, at the time he assisted Ms. Valenta in the selection decisions, had never discussed with anyone plaintiff's medical history or the fact that he had taken STD leave (or anything else about plaintiff, in fact). There is no evidence that Ms. Valenta or Mr. Lampe ever looked at plaintiff's personnel file (which presumably would have reflected his STD leave) at any time prior to releasing him from employment and it is undisputed that neither she nor Mr. Lampe never looked at plaintiff's performance reviews. The absence of any evidence suggesting that Ms. Valenta or Mr. Lampe had knowledge of plaintiff's medical status, coupled with the absence of any evidence linking Ms. Odneal or Mr. Bryson to the decision to release plaintiff from employment, precludes any jury from concluding that defendants terminated plaintiff's employment because of his perceived disability. *See id.* (Plaintiff "cites no legal authority and makes no factual argument explaining how the views of a non-decision maker . . . could prove King Soopers regarded him as disabled for purposes of the Americans with Disabilities Act.") (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (holding administrative staff member's beliefs regarding plaintiff's back injury were not attributable to

employer where staff member had no authority to make employment decisions)).

For the foregoing reasons, summary judgment is granted in favor of defendants on plaintiff's disability discrimination claim.

### D.    Plaintiff's Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, plaintiff must show that he engaged in protected opposition to discrimination; that defendants took an adverse employment action against him which a reasonable person would have found materially adverse; and that a causal connection exists between the protected activity and the materially adverse action.  *See Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc*., 452 F.3d 1193, 1198 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405 (2006))).  In their motion for summary judgment, defendants concede that plaintiff has established the first two elements of his prima facie case but contends that summary judgment is appropriate as plaintiff has failed to show genuine issues of material fact as to the third element of his prima facie case–whether a causal connection exists between plaintiff's complaints of age discrimination and the decision to release him from his employment with defendants.  Specifically, defendants contend that plaintiff cannot establish a causal connection because nearly twenty months passed between his complaints of discrimination and his release from employment and, in any event, the decision to release plaintiff was made by Ms. Valenta, who undisputedly had no knowledge that plaintiff had complained about age discrimination.

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Haynes*, 456 F.3d at 1228 (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. *Id*. Otherwise, "the plaintiff must offer additional evidence to establish causation." *Id*. (quoting *O'Neal*, 237 F.3d at 1253). In *Haynes*, the Circuit held that a seven-month period between protected activity and adverse action will not, by itself, establish causation. *See id.* (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[A] three-month period, standing alone, is insufficient to establish causation.").

Plaintiff made two complaints of age discrimination, both in March 2002. In early March 2002, he sent a letter to Mr. Bryson, Mr. Corwin and Deb Sprayberry in which he questioned whether his negative performance review had been the result of age discrimination. Later that month, he asked Jed Dodd whether he had been the victim of age discrimination. Defendants released plaintiff from his employment in October 2003, twenty months after plaintiff's complaints. While plaintiff concedes that a twenty-month gap would typically be too long to support an inference of causation, he asserts that a causal connection may nonetheless be inferred when retaliatory action cannot be taken because the employee is on leave and an adverse action occurs soon after the employee returns to work. *See Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1216-17 (10th Cir. 2003) (while five-month gap between protected activity and demotion ordinarily would be too long to imply causation, Circuit nonetheless found sufficient

evidence of causal connection where plaintiff went on medical leave two days after she filed her complaint, was on leave for nearly five months, and was demoted just seven days after her return to work). However, even discounting the period of time when plaintiff was on STD leave, there still exists a significant gap between plaintiff's complaints and his release from employment. Plaintiff returned from leave in December 2002 and, again, was not released until October 2003, a period of eleven months. Plaintiff, then, cannot benefit from the principle set forth in *Wells*.

Plaintiff, relying on *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324 (10th Cir. 1996), also contends that he is not required to show close temporal proximity in this case because a "pattern of retaliatory conduct" began soon after plaintiff's complaints and only culminated later in his release from employment. The pattern of retaliatory conduct referenced by plaintiff includes Ms. Odneal's and Mr. Bryson's treatment of him while he was on STD leave and the negative performance review he received upon his return from STD leave. Assuming that Ms. Odneal's and Mr. Bryson's treatment of plaintiff, including plaintiff's negative performance evaluation, constituted retaliatory conduct based on plaintiff's complaints,[10] this assumption does not establish an inference that Ms. Odneal's and Mr. Bryson's motive carried over to Ms. Valenta's decision, more than eleven months after plaintiff's return from STD leave and more than six months after plaintiff's negative performance review, to release plaintiff from employment during a reorganization. *See Haynes*, 456 F.3d at 1228 (supervisor's decision to place plaintiff

---

[10]This assumption, admittedly, is a fairly difficult one to make as the record is devoid of evidence suggesting that Ms. Odneal had any knowledge of plaintiff's complaints of discrimination.

on performance improvement plan in retaliation for complaining about supervisor's allegedly discriminatory conduct "does not establish an inference" that the supervisor's "motive carried over" to Senior Vice President's decision to terminate plaintiff in RIF where supervisor had no involvement in decision as to who would be terminated in RIF and, at the time he placed plaintiff on the performance improvement plan, did not anticipate RIF) (citing *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1203 (10th Cir. 2003) ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination.")).  Critically, plaintiff has no evidence whatsoever linking Ms. Odneal or Mr. Bryson to the decision to release plaintiff from his employment.  Plaintiff does not dispute that neither Ms. Valenta nor Mr. Lampe ever discussed plaintiff with either Ms. Odneal or Mr. Bryson (or anyone else who may have engaged in retaliatory conduct against plaintiff or who may have had knowledge of plaintiff's complaints) at any time prior to the time the decision was made to release plaintiff from his employment.

Finally, it is undisputed that neither Ms. Valenta nor Mr. Lampe had any knowledge of plaintiff's discrimination complaints.  For this reason, too, plaintiff cannot establish a causal connection between his complaints of discrimination and the decision to release him from his employment.  *See Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188-89 (10th Cir. 2002) (To establish a prima facie case of retaliation, plaintiff must show, among other things, that the individual who made the decision regarding the materially adverse action had knowledge of plaintiff's complaint) (citing *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)); *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1235 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decisionmaker

31

knew of plaintiff's protected activity at time discharge decision was made); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 534 (10th Cir. 1998) (same).

In light of the foregoing circumstances, no reasonable jury could find a causal connection between plaintiff's discrimination complaints and defendants' decision to release him from employment. Summary judgment on this claim in favor of defendants is warranted.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment on all claims (doc. 52) is granted in its entirety.

**IT IS SO ORDERED.**

Dated this 13th day of September, 2006, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge